UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STOLT TANKERS B.V. (f/k/a STOLT-NIELSEN TRANSPORTATION GROUP B.V.), | 08 CIV. 4382 (SAS)(JCF) |
| | ECF CASE |
| Plaintiff, | |
| -against- | |
| GEONET ETHANOL, LLC, | **DECLARATION OF J. BRENT BAKER** |
| Defendant. | |

J. Brent Baker, pursuant to the provisions of 28 U.S.C. § 1746 declares and states as follows:

1. I am the Chief Executive Officer of Geonet Ethanol, LLC ("Geonet"), the defendant in this action. I make this declaration in support of Geonet's motion to vacate the attachment ordered by this Court on May 14, 2008, or, in the alternative, directing limited discovery on the extent to which Plaintiff Stolt Tankers B.V. ("Stolt B.V.") may be found in the Southern District of Texas. The statements made in this declaration are based upon my personal knowledge and company records except as otherwise described.

2. Geonet is a U.S. Virgin Islands Limited Liability Company ("LLC") registered as a foreign LLC to do business in Texas since June 19, 2007. (Attached as Exhibit 1 is a copy of the certificate of the fact of such registration from the Secretary of State of the State of Texas, together with a certified copy of Geonet's application for registration.) Since that time, it has maintained a designated agent for the service of process in Texas. Additionally, Geonet's CEO, me, and its Corporate Secretary both maintain

offices with an affiliated company, Geonet Utilities, Inc., located at 1001 McKinney, Suite 1650, Houston, Texas. Geonet regularly engages in large dollar transactions, in the millions of dollars, with customers based in Houston.

3. Part of Geonet's business involves purchasing hydrous ethanol from Brazil, shipping it to Geonet's dehydration facility in St. Croix and then shipping processed anhydrous ethanol to the eastern United States. In late 2006 and early 2007, Geonet was seeking proposals from shipping companies to transport hydrous and anhydrous ethanol. One such proposal sought was for the transportation of processed anhydrous ethanol from St. Croix to ports on the east coast of the United States. Stolt-Nielsen Transportation Group, Inc. ("Stolt Inc.") negotiated the Contract of Affreightment ("COA") with Geonet for that business which COA, entered into between the parties on or about June 1, 2007, is the subject of this case. (A true copy of the COA is annexed hereto as Exhibit 2.)

4. The COA was negotiated in part through a broker, Sound Tanker Chartering, but also directly between Geonet and Stolt, Inc. Phil Dalton, an officer of Geonet who is no longer with the company, in addition to meeting with Mark Ellenberger of Sound Tanker and participating in many telephone calls with Mr. Ellenberger and Stolt, Inc. personnel, met in person multiple times with Stolt, Inc. personnel. Many of those meetings took place in Houston, Texas. I know this because I met and spoke daily with Mr. Dalton and received reports from him of the discussions. Dale Hudson of Geonet also participated in meetings with Stolt, Inc. personnel. These meetings took place not only up to the time of the execution of the COA at the end of May, 2007, but through October, 2007, when the difficulties that resulted in Geonet declaring force majeure occurred. The

meetings first dealt with the negotiation of the COA, then, once it had been executed, with operational issues. In October, the meetings dealt with the problems that resulted in the declaration of force majeure.

5. I personally met with officers of Stolt, Inc. on at least three occasions. One meeting was in New York City and two were in Houston, Texas. The Stolt, Inc. officers with whom I personally met at various times, according to the business cards that they gave to me, are:

Andrew Adams
General Manager
Stolt-Nielsen Transportation Group, Inc.
15638 Jacintoport Blvd.
Houston, TX 77015-5534

Raymond R. Long
Business Director
Atlantic Ocean Service, SVP
Stolt-Nielsen Transportation Group, Inc.
800 Connecticut Avenue, 4th Floor East
Norwalk, CT 06854

Kevin J. Chimento
Marketing Manager
Stolt-Nielsen Transportation Group, Inc.
2444 English Turn Road
Braithwaite, LA 70040

James S. Fleming
Marketing Manager
Latin American Service, Tankers Division
Stolt-Nielsen Transportation Group, Inc.
800 Connecticut Avenue
Norwalk, CT 06854

Of the officers from Connecticut, one traveled to Houston for one of the meetings that I attended and the other attended the meeting in New York City.

6. The COA, upon which Stolt B.V. bases its complaint, states on the signature page (p. 27) that Stolt-Nielsen Transportation Group, Inc. (hereinafter "Stolt, Inc.") signed as agents for Stolt B.V. In fact, the COA was entirely negotiated on Stolt B.V.'s behalf by officers and personnel of Stolt, Inc. in the series of meetings in Houston and in New York City described above. In fact, its General Manager, Andrew Adams, resident in its Houston office, actually signed the COA. As I described, the officers of both Geonet and Stolt, Inc. have known at least since the spring of 2007 where each were located in Houston and dealt with each other extensively in connection with the COA.

3

7.  I have positions with companies related to Geonet Ethanol, LLC, including Geonet Utlities, as I noted above.   The same is true of Terrell Wilson, the Corporate Secretary of Geonet Ethanol.  We work in different capacities for different companies from our offices at Geonet Utilities in Houston.  Geonet Ethanol and Geonet Utilites are sister companies, with common owners.  As officers of Geonet Ethanol, Ms. Wilson and I are both authorized to receive service of process upon Geonet Ethanol.  For the duration of the existence of Geonet Ethanol, going back before the negotiation of the COA began and to the present, I and a second officer of Geonet Ethanol have maintained offices with an affiliated company in Houston.

8.  As CEO of Geonet Ethanol, I am familiar with its operations, including its sales to companies in the United States.  We have major customers in Houston, Texas, among other places.  Three of them, Shell Oil, Conoco Philips and Petrobras, have corporate offices and facilities with which we do business.  They, alone, accounted for more than 50 million dollars of sales in 2007 and more than 80 million dollars in sales so far in 2008.  We also do business with other major companies that have offices in Houston, although we deal with other of their offices directly.  Some of those are in other Texas cities, such as San Antonio.

9.  Geonet has been registered with the New York Secretary of State as a foreign limited liability company doing business in the state since December 11, 2006 and is still so licensed.  (Attached as Exhibit 3 is a copy of the certificate of the fact of such registration from the Department of State of the State of New York, together with a certified copy of Geonet's application for registration.)  As I understand we are legally required to do, the Secretary of State is designated as agent for the service of process.

4

Further, Geonet has had a designated agent for service of process within the state, Capitol Services, during this time.

Dated: New York, New York

June 18, 2008

I declare under penalty of perjury that the foregoing is true and correct.

J. Brent Baker



Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Phil Wilson
Secretary of State

# Office of the Secretary of State

### Certificate of Fact

The undersigned, as Secretary of State of Texas, does hereby certify that the document, Application for Registration for GeoNet Ethanol, LLC (file number 800831684), a Foreign Limited Liability Company (LLC), was filed in this office on June 19, 2007.

It is further certified that the entity status in Texas is in existence.

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on June 16, 2008.



Phil Wilson
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555          Fax: (512) 463-5709          Dial: 7-1-1 for Relay Services
Prepared by: SOS-WEB          TID: 10264          Document: 219003050032

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Phil Wilson
Secretary of State

## Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

GeoNet Ethanol, LLC
Filing Number: 800831684

Application for Registration

June 19, 2007

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on June 16, 2008.



Phil Wilson
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555          Fax: (512) 463-5709          Dial: 7-1-1 for Relay Services
Prepared by: SOS-WEB          TID: 10266          Document: 219003050031

| Form 304 (Revised 1/06) | | This space reserved for office use. |
|---|---|---|
| Return in duplicate to: Secretary of State P.O. Box 13697 Austin, TX 78711-3697 512 463-5555 FAX: 512/463-5709 **Filing Fee: $750** | **Application for Registration of a Foreign Limited Liability Company** | FILED In the Office of the Secretary of State of Texas JUN 1 9 2007 Corporations Section |

1. The entity is a foreign limited liability company. The name of the entity is:

GeoNet Ethanol, LLC

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited liability company" or "limited company" (or an abbreviation thereof). The name of the entity with the word or abbreviation that it elects to add for use in Texas is:

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:

3. Its federal employer identification number is:  66-0671516

☐ Federal employer identification number information is not available at this time.

4. It is organized under the laws of: (set forth state or foreign country)  U.S. Virgin Islands

and the date of its formation in that jurisdiction is:  11/04/2005
*mm/dd/yyyy*

5. As of the date of filing, the undersigned certifies that the foreign limited liability company currently exists as a valid limited liability company under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the limited liability company that it proposes to pursue in the transaction of business in Texas are set forth below. The entity also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is organized.

Importation and sales of anhydrous fuel ethanol to customers for use in making gasohol.

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is:  07/02/2007
*mm/dd/yyyy*

8. The principal office address of the limited liability company is:

| One Estate Anguilla, PO Box 2090 | Kingshill | VI | U.S. Virgin Islands | 00851-2090 |
|---|---|---|---|---|
| *Address* | *City* | *State* | *Country* | *Zip/Postal Code* |

RECEIVED

Form 304  JUN 1 9 2007          5

Secretary of State

Complete item 9A or 9B, but not both.  Complete item 9C.

[x]  9A.  The registered agent is an organization (cannot be entity named above) by the name of:

Capitol Corporate Services, Inc.

OR

[ ]  9B.  The registered agent is an individual resident of the state whose name is:

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

9C.  The business address of the registered agent and the registered office address is:

| | | | |
|---|---|---|---|
| 800 Brazos, Suite 400 | Austin | TX | 78701 |
| *Street Address* | *City* | *State* | *Zip Code* |

10.  The entity hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11.  The name and address of each governing person is:

**NAME OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| J. Brent | | Baker | |
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

| |
|---|
| *Organization Name* |

**ADDRESS OF GOVERNING PERSON**

| | | | | |
|---|---|---|---|---|
| One Estate Anguilla, PO Box 2090 | Kingshill | VI | U.S. Virgin Islands | 00851-2090 |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

**NAME OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| Phil | A. | Dalton | |
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

| |
|---|
| *Organization Name* |

**ADDRESS OF GOVERNING PERSON**

| | | | | |
|---|---|---|---|---|
| One Estate Anguilla, PO Box 2090 | Kingshill | VI | U.S. Virgin Islands | 00851-2090 |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

**NAME OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| | | | |
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

| |
|---|
| *Organization Name* |

**ADDRESS OF GOVERNING PERSON**

| | | | | |
|---|---|---|---|---|
| | | | | |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

Form 304                                        6

## Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

## Effectiveness of Filing (Select either A, B, or C.)

A. [x] This document becomes effective when the document is filed by the secretary of state.

B. [ ] This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. [ ] This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____

_____

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: __6/12/07__

J. Brent Baker, President & CEO
Signature and title of authorized person on behalf of the foreign entity

# Contract of Affreightment

## June 1, 2007

# GeoNet Ethanol LLC

## and

# Stolt-Nielsen Transportation Group B.V.



**GeoNet - Stolt Nielsen Subject Agreement**

# Table of Contents

1. Contract of Affreightment

2. Stolt-Nielsen Terms

3. GeoNet Terms

4. Exhibit 'A' – Asbatank C/P Form

5. Exhibit 'B' – Stolt Nielsen Bill of Lading form

6. Exhibit 'C' – Confidentiality Agreement

7. Exhibit 'D' – Contact List



**GeoNet - Stolt Nielsen Subject Agreement**

## Contract of Affreightment

It is this day, June 1, 2007, mutually agreed between Stolt-Nielsen Transportation Group B.V. (hereinafter called the "Owner") and GeoNet Ethanol LLC (hereinafter called the "Charterer") to enter into the following Contract of Affreightment ("COA"). In this COA, Owner and Charterer may each be referred to as a "Party" and collectively they may be referred to as the "Parties."

## Asbatankvoy
## Part 1

### 1. TONNAGE

Stolt-Nielsen Transportation Group BV owned or chartered or procured tonnage ("Contract Vessel") as per an agreed vessel schedule. Each vessel transporting cargo under this COA must be approved by Charterer.

### 2. PERIOD

One (1) year to commence upon confirmation of the first lifting ("Effective Date) Such first lifting to take place between June 15, 2007 and July 15, 2007, and confirmation of the first lifting is to be given by Charterer by May 31, 2007 as per nomination clause below .

### 3. CARGO

A minimum of 11,000 metric tons (mt) and a maximum of up to full vessel capacity of, in Charterer's option, one or more grades ethanol, which shall be segregated according to grade. Always within the vessel's natural segregation.

### 4. FREQUENCY

Charterer to provide a minimum 11,000 mt of cargo twice per month.  Owner to provide two (2) sailings of minimum 11,000 mt capacity per month, evenly spread. The liftings shall be spaced with a minimum of 13 days and a maximum of 20 days separation between sailings. If Owner wishes to substitute tonnage, Owner will coordinate the vessel substitution to meet the scheduled delivery of cargo to Charterer's customers.



**GeoNet - Stolt Nielsen Subject Agreement**

## 5. NOMINATION

a.  Charterer will designate a thirty (30) day load window for the first lifting by May 31, 2007 whereby Owner will nominate performing tonnage.

b.  Twenty (20) days prior to the load window designated in clause 5(a) above, Charterer will further narrow the load window for the first lifting to 15 days, at which time Owner will nominate a 10 day laycan within Charterer's load window.

c.  Fifteen (15) days prior to the laycan designated in clause 5(b) above, Owner will further narrow laycan to 5 days.

d.  Owner will subsequently nominate 2 sailings per month with a minimum capacity of 11,000 mt per sailing adhering to Clauses 4, 5(b) and 5(c) with regard to nomination timing.

e.  Owner and Charterer agree to work together in good faith to accommodate eventual port delays and/or production or supply issues.

f.  Charterer's customers, or a government having jurisdiction over the shipping of ethanol, may require double hull tonnage. In such event, Charterer will advise Owner a minimum of 15 days ahead of such anticipated sailing and Owner will either nominate acceptable double hull tonnage or Charterer will be free to enter the market to secure suitable double hull tonnage.

g.  If Charterer must secure tonnage outside this Contract of Affreightment, per clause 5(f) above, Charterer and Owner will work in good faith to maintain the 2 sailings per month schedule. Additionally, if Charterer must secure tonnage outside this Contract of Affreightment, then the volume lifted by the outside tonnage will be deducted from the volume to be carried pursuant to this Contract of Affreightment.

h.  If Owner is not able to adhere to the sailing schedule of 2 sailings per month in any given month because of weather, equipment problems or other reason excused by Charterer, with a minimum of 13 days and a maximum of 20 days separation between sailings, Charterer is relieved of its obligation to provide 11,000 mt of cargo for that missed shipment and Charterer is free to enter the market for any single lifting affected by Owner's inability to adhere to the sailing schedule without recourse or cost to either party, with respect to 11,000 mt of shipment not provided by Owner. Owner and Charterer will work in good faith to reestablish the sailing schedule of 2 sailings per month, starting as soon as possible but no later than the next calendar month after Owner failed to provide a sailing.



**GeoNet - Stolt Nielsen Subject Agreement**

### 6. LOAD

One safe berth St. Croix, US Virgin Islands or one safe berth Kingston, Jamaica.

### 7. DISCHARGE

a.  United States Atlantic coast not south of Baltimore, Maryland or north of North Providence, Rhode Island.

b.  Intended discharge options:

   1.  Philadelphia - Baltimore range, including Paulsboro and any safe and accessible port therein.

   2.  New York Harbor/Sewaren and Carteret - Providence range, including New Haven, Bridgeport and any safe and accessible port therein.

Other ports may be designated for discharge by prior written agreement between the Parties.

### 8. FREIGHT

United States Dollars (USD) 25.75 per metric ton (pmt) of cargo for a single port discharge. For a two port discharge:

   i.  Additional for 2nd port discharge group set forth in Clause 7(b)(1) - USD 3.00 pmt.

   ii.  Additional for 2nd port discharge group set forth in Clause 7(b)(2) - USD 2.75 pmt.

Base freight rate to increase from USD 25.75 to USD 27.00 pmt commencing with shipments with bill of lading dated on or after April 1, 2008.

### 9. UTILIZATION

For quantities over 12,000 mt up to 15,000 mt per sailing, the freight will decrease for the entire cargo by USD 0.50 per 1000 mt for every 1,000 mt shipped in excess of 11,000 mt up to a maximum of 15,000 mt.



5/21/2007

**GeoNet - Stolt Nielsen Subject Agreement**

### 10. LAYTIME

Pump rates of 300 metric tons per hour at load, 250 metric tons per hour at discharge, with Sundays and holidays included fully reversible.

### 11. DEMURRAGE

Demurrage shall be charged at a rate of USD 15,500 per day, pro rata thereof. Laytime shall be recorded and accounted for every quarter.  If demurrage is owed, Charterer will pay Owner in a timely manner.

### 12. DIVERSION

Notwithstanding anything else to the contrary in this Charter Party and not withstanding what loading and/or discharging port(s)/range(s) may have been nominated and Bill(s) of Lading issued, Charterer shall have the right to change its nomination of the loading and/or discharging port(s)/range(s) in accordance with Clauses 6 and 7 above. Any extra time and expenses incurred by Owner in complying with Charterer's orders shall be for Charterer's account and calculated in accordance with Part II, Clause 4(c) of Asbatankvoy Charter Party Form.

### 13. CHARTER-PARTY

Asbatankvoy with Stolt Tanker and GeoNet Ethanol clauses (amended)

### 14. COMMISSION

A commission of 2.5% total will be paid by Owner to Sound Tanker Charting on Freight/Deadfreight/Demurrage as paid.  However, Sound Tanker Chartering shall not be entitled to any commission on any increased freight or deadfreight resulting from the application of the fuel adjustments in Clause 16 (Bunker Clause) of the attached Stolt Tankers Additional Clauses.



**GeoNet - Stolt Nielsen Subject Agreement**

STOLT TANKERS ADDITIONAL CLAUSES
ASBATANKVOY (10/77) CHARTER PARTY
Stolt Voyage Chartering Terms 2006
Contract of Affreightment

## 1.    CHARTER PARTY ADMINISTRATION

This Contract is subject to Owner's management/legal approval to be lifted within 5 working days of reaching agreement on all other terms and conditions and subject to Charterer management review/approval 5 working days after Owner lifts all subjects. The governing charter party provisions shall be ASBATANKVOY Charter Party Form, Part II, the commercial terms/ASBATANKVOY Part I, and the Stolt Tankers Additional Clauses 1-46 (amended) and the GeoNet Ethanol LLC Terms stated herein. To the extent there is conflict between the printed Charter Party Form and the Stolt Tankers Additional Clauses or the GeoNet Ethanol LLC Terms, the Stolt Tankers Additional Clauses and the GeoNet Ethanol LLC Terms shall prevail over the printed Charter Party Form. The GeoNet Ethanol LLC Terms and the Stolt Tankers Additional Clauses shall have equal weight.

## 2.    FREIGHT EARNED AND PAYABLE CLAUSE

Freight is due and payable without discount three (3) working days after signing bills of lading ("B/L") or before breaking bulk ("BBB"), whichever is sooner, and shall be paid at that time to Owner's designated account in U. S. currency.  Full freight to the discharge port named in Part 1 or declared by the Charterer in accordance with this Charter shall be completely earned on all cargo loaded and the Owner shall be entitled to receive and retain such freight irrevocably under all circumstances, whatsoever, ship and or cargo lost or not lost, whether or not the cargo is damaged or unsound, or in the event the voyage is abandoned or broken up.

## 3.    ADDITIONAL BERTH CLAUSE  (Deleted)

## 4.    COMPLETION/ROTATION CLAUSE

Should Charterer nominate two port discharge the rotation of the discharge ports will be in Charterer's option and will be declared latest 24 hours after sailing from the load port. Notice shall be in writing to Owner's representatives in Houston and shall not be given directly to the vessel.



## GeoNet - Stolt Nielsen Subject Agreement

5. **LIBERTIES CLAUSE (VEGOILVOY FORM)(Deleted)**

6. **NOTICE OF READINESS  (Deleted)**

7. **LAYTIME CLAUSE  (Deleted)**

8. **HOURS FOR LOADING AND DISCHARGING**

Insert and make part of Clause 7:  "The Vessel shall have the right to sail from all ports immediately upon completion of loading or discharging whether or not laytime has expired, subject to any applicable port or governmental rules and regulations. The loading port at St. Croix is designated as "daytime only".  Should the vessel arrive at night, the vessel may tender Notice of Readiness ("NOR") upon arrival, however laytime shall not commence to count until daylight or at the expiry of six (6) hours notice time, whichever occurs last.

9. **DUES/WHARFAGE/TAXES  (Deleted)**

10. **DETENTION CLAUSE (Deleted)**

11. **CANCELLATION CLAUSE**

Owner shall use its best efforts to have its ship arrive before 1600 hours on canceling date, i.e., the last day of laycan.  However, Charterer's sole remedy for Ship's failure to arrive before 1600 hours on canceling date is cancellation of this Charter Party.  Such election must be made within 24 hours after canceling date; otherwise all provisions under this Charter Party shall remain in full effect.  Consequential damages of any type are not recoverable by Charterer or Owner.

12. **CLEANING CLAUSE   (Deleted in favor of GeoNet Clause 3)**

13. **PREPUMPING CLAUSE   (Deleted)**

14. **CONDENSATION CLAUSE   (Deleted)**

15. **NITROGEN CLAUSE**

Nitrogen is not required for the carriage of anhydrous ethanol under the terms of this Charter Party. If Owner elects to purge or pad Charterer's tanks with nitrogen for any other purpose including international regulations in effect at the inception of this contract, all costs and/or time associated with this activity shall be for Owner's account.

16. **BUNKER CLAUSE**

If the bunkers price for HFO 380 rises above Three Hundred Fifty US Dollars ("USD")($350.00), a bunkers surcharge will apply.  If the bunkers price for HFO 380 falls below Two Hundred US Dollars ($200.00), a bunkers credit will apply.  The bunkers surcharge or credit shall be USD 0.02 per metric ton of cargo loaded times the difference in the bunkers prices above USD 350.00 (for the surcharge) or below USD 200.00 (for the credit). There shall be no bunker surcharge or credit given unless the bunkers price is above USD 350.00 pmt or below USD 200.00 pmt, as determined by the Platt's reference price for HFO 380 at the Port of Houston on the bill of lading date



5/21/2007

**GeoNet - Stolt Nielsen Subject Agreement**

for each loading. All adjustments for bunkers charges under this Clause 16 are to be calculated, aggregated and settled on a quarterly basis. If an aggregate bunkers surcharge is owed, Owner will invoice Charterer and Charterer will pay such invoice within thirty (30) days of recipt. If an aggregate bunkers credit is due, Owner will promptly credit Charterer's account for freight and shall notify Charterer of the credit applied to Charterer's account.

**17.   WASTE DISPOSAL (Deleted)**

**18.   TRANSSHIPMENT CLAUSE (Deleted)**

**19.   CHARTERER'S COASTER/BARGE CLAUSE (Deleted)**

**20.   CHARTERER'S QUALIFIED PERSONNEL CLAUSE**

All personnel boarding the ship on Charterer's behalf will comply with all vessel safety requirements as requested by the master. They shall also be familiar with and adhere to the International Chamber of Shipping Tanker Safety Guide (Chemicals). Nothing in this clause relieves the Charterer of its obligation to ensure that personnel acting on its behalf at all times conduct themselves in the highest professional manner, consistent with safety and efficiency.

**21.   ISM CLAUSE**

From the date of coming into force of the International Safety Management ("ISM") Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owner shall ensure that the vessel and "The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owner shall provide a copy of the relevant Document of Compliance ("DOC") and Safety Management Certificate ("SMC") to the Charterer.

**22.   FOREIGN CORRUPT PRACTICES ACT CLAUSE**

A.   Charterer and Owner hereby represent and warrant that no payments of money or anything of value has been or will be offered, promised, or paid, directly or indirectly, to any non-U.S. government officials (as defined in the U.S. Foreign Corrupt Practices Act, hereinafter "FCPA"), including employees or officials of government-owned enterprises or public international organizations, political parties, party officials, or candidates for non-U.S. public or political party office, in violation of the FCPA, to influence the acts of such persons or organizations in their official capacities, or to induce them to use their influence with a non-U.S. government to obtain an improper business advantage in connection with this contract or any extension or renewal thereof.

B.   Any breach of such representations and undertakings shall constitute a material breach of this Charter Party and may result in immediate termination.



**GeoNet - Stolt Nielsen Subject Agreement**

23. **RESTRICTED TRADE CLAUSE**

Charterer warrants that it will only instruct the vessel to carry lawful cargo and to trade in lawful trade lanes and, in particular, that they will not (i) load cargo, (ii) cause the vessel to trade in places and/or (iii) give orders, which would put Owner, Disponent Owners or the Vessel in breach of any applicable law (including, but not limited to, the laws applicable to this Charter Party, the place of performance, the flag of the vessel and/or any places where Owner or Disponent Owners have offices). Notwithstanding anything in this Charter Party to the contrary, this Charter Party shall not be interpreted or applied so as to require Owner or Charterer to do, or to refrain from doing, anything which would constitute a violation of, or result in a loss of economic benefit, under United States anti-boycott laws and regulations.

24. **PANAMA CANAL CLAUSE (Deleted)**

25. **PANAMA CANAL TOLLS (Deleted)**

26. **PANAMA CANAL DELAY (Deleted)**

27. **SUEZ CANAL CLAUSE (Deleted)**

28. **SUEZ CANAL TOLLS (Deleted)**

29. **WAR RISKS CLAUSE**

Delete Clause 20(b)(vi)(a) Part II of ASBATANKVOY and replace with BIMCO's War Risk Clause:

**WAR RISKS CLAUSE FOR VOYAGE CHARTERING, 2004 (Code Name: VOYWAR 2004)**

A. For the purpose of this Clause, the words:

1. "Owner" and "Owners" shall include the Ship Owner(s), Bare Boat Charterer, Disponent Owner(s), managers or other operators who are charged with the management of the Vessel, and the Master; and

2. "War Risks" shall include any actual, threatened or reported:

War; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or the Owner(s), may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

B. If at any time before the Vessel commences loading, it appears that, in the reasonable judgment of the Master and/or the Owner(s), performance of the Contract of



**GeoNet - Stolt Nielsen Subject Agreement**

Affreightment, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owner(s) may give notice to the Charterer, in writing, suspending performance of the Parties hereunder for a specific shipping or for a period of up to six (6) months or until the War Risks is eliminated, or if the period of time exceeds six (6) months Owner(s) may cancel this Contract of Affreightment, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Affreightment provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterer the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterer to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Affreightment if the Charterer shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

C.    The Owner(s) shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgment of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may request the Charterer, in writing, to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterer shall not have nominated such a port, the Owner(s) may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfillment of the Contract of Affreightment. The Owners shall be entitled to recover from the Charterer the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 250 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

D.    If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgment of the Master and/or the Owner(s), the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owner(s) shall give fourteen (14) days notice to the Charterer that this route will be taken. In this event the Owner(s) shall be entitled, if the total extra distance exceeds 250 miles, to additional freight which shall be the same



**GeoNet - Stolt Nielsen Subject Agreement**

percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

E.   1.   The Owner(s) may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for the Owner's account.

2.   If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterer's orders, or in order to fulfill the Owner's obligation under this Charter Party, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterer to the Owner(s) within 14 days after receipt of the Owner's invoice. If the Vessel discharges all of her cargo within an area subject to additional premiums as herein set forth, the Charterer shall reimburse the Owner(s) for the actual additional premiums paid which may accrue from completion of discharge until the Vessel leaves such area or areas referred to above. The Owners shall leave the area as soon as possible after completion of discharge.

3.   Owner shall notify Charterer in writing fourteen (14) days prior to obtaining any such war risks insurance that might be billed to Charterer and shall discuss the need for such insurance.

F.   The Vessel shall have liberty:

1.   to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

2.   to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

3.   to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

4.   to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;


SOUNDTANKER
CHARTERING

**GeoNet - Stolt Nielsen Subject Agreement**

5.  to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions; and

6.  where cargo has not been loaded or has been discharged by the Owners under any provision of Clause 29(F)(1-5) above, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

G.  If in compliance with any of the provisions of sub-clauses (B) to (F) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfillment of the Contract of Affreightment.

**30.  U.S. CHEMICAL DIVERSION AND TRAFFICKING CLAUSE**

It is Charterer's sole responsibility to inform the U.S. Drug Enforcement Agency (DEA), pursuant to U.S. Chemical Diversion and Trafficking Act, of all required information concerning this cargo and its shipment to the USA or through U.S. territorial waters.  Any customs penalties or other fines/penalties, which result from improper or late filing of customs declarations, other than those set forth in the preceding sentence, are to be paid by the **Owner**.

**31.  USA PORT/BERTH NOTIFICATION CLAUSE**

All Port/Berth declarations must be reported by Owner to the United States Coast Guard (USCG) twenty-four (24) hours or ninety-six (96) hours, as required by the United States Coast Guard for the port, prior to ships arrival of the U.S. port including:
1.  Name of Receiving Facility
2.  Port or place of destination
3.  City
4.  State

Charterer must provide Owner with confirmed port and berth declarations forty-eight (48) hours prior to the ships arrival of the U.S. port.  Ship delays as a result of the failure to provide such information on port and berth will be for the Charterer's time, risk and expense.  Such delays shall not count as laytime and shall be invoiced separately at a rate of Six Hundred Forty-five US Dollars and 83/100 ($645.83) per hour.



**GeoNet - Stolt Nielsen Subject Agreement**

**32.  USA POLLUTION CLAUSE (Deleted)**

**33.  MARITIME SECURITY  (Deleted)**

**34.  AUTOMATED MANIFEST SYSTEM CLAUSE  (Deleted)**

**35.  HARDSHIP CLAUSE**

If Owner as a result of official or policy action by governments or other non-governmental commercial organizations suffer an increase in cost which is deemed by Owner sufficient to cause hardship, the Owner shall have the right to approach Charterer for a review of rates, with the intent to recover only the actual additional costs.  If no agreement can be reached on rate adjustments Owner has the option of canceling this contract.

**36.  BILL OF LADING CLAUSE**

It is understood that carriage of this cargo will be pursuant to the terms and conditions of the Stolt Tankers standard Bill of Lading, a copy of which is available on request from Stolt Tankers or any of its agents.  The Master shall, upon request, sign Bills of Lading without prejudice to the rights of the Owners and Charterer under the terms of this Charter Party.  The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth in this Charter Party and such terms shall be incorporated and deemed incorporated by reference in any such Bill of Lading, including Clause Paramount, New Jason, General Average, Both to Blame, War Risk, and Arbitration.

**37.  GENERAL AVERAGE CLAUSE**

General Average shall be adjusted, stated and settled according to the York-Antwerp Rules of 1994 at such port or place as may be selected by the Owner and according to the laws and usages at the port or place of adjustment.  All disbursements and payments shall be stated in U.S. Dollars.

**38.  USA CLAUSE PARAMOUNT**

This Contract of Affreightment is subject to the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, and shall have effect subject to the provisions of said Act, which shall be deemed incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act.  If any term of this Contract of Affreightment is repugnant to the said Act as so incorporated, such terms shall be void to that extent but no further.  Any Bills of Lading issued in connection with this Contract of Affreightment shall incorporate the said Act.

**39.  BOTH TO BLAME COLLISION CLAUSE**

Replace all references to "Owner" in Clause 20(b)(ii) Part II of ASBATANKVOY with "carrier" in that carrier is defined within ASBATANKVOY to include both Owner, Chartered Owner, and Disponent Owner of the vessel.



**40.    NEW JASON CLAUSE**

Replace all references to "Owner" in Clause 20(b)(iv) Part II of ASBATANKVOY with "carrier" in that carrier is defined within ASBATANKVOY to include both Owner, Chartered Owner, and Disponent Owner of the vessel.

**41.    CARGO LOSS CLAUSE**

Owner's liability for any shortages shall be limited to losses in excess of 0.3% as calculated by the actual losses based upon the ship's ullages at load port figure versus the ship's predischarge figures, measured on board by the Charterer's appointed surveyor as witnessed by and in concurrence with the vessel's Master or his designated representative. Loss, if any, to be reimbursed by Owner to Charterer at Charterer's Free on Board ("FOB") price plus freight, subject to all applicable limitations of liability, as legally permitted, unless such loss is completely excused under the provisions of the charter party, including but not limited to the applicable General Exceptions or Force Majeure Clause. For the purposes of this clause, the same density tables to be used by the surveyors in determining loaded and discharged quantities. The bill of lading quantity and the quantity discharged will be determined by Charterer's appointed surveyor.

**42.    DEMURRAGE TIME BAR CLAUSE**

Owner must submit to Charterer its demurrage invoice and supporting documentation to include Notice of Readiness, Statement of Facts, any Letters of Protest, vessel pumping logs and, if available, terminal pumping logs, within ninety (90) days of final discharge of a particular cargo under this Contract of Affreightment. Failure to dispatch such invoice within said time will render Owner's claim for demurrage time barred. Charterer agrees that failure to dispute Owner's demurrage invoice within thirty (30) days of receipt will render invoice valid and any dispute received thereafter will be deemed time-barred.

**43.    LAST REFUSAL (Deleted)**

**44.    ARBITRATION CLAUSE**

This Charter Party shall be governed by and construed in accordance with the General Maritime Law of the United States and to the extent that application of state law becomes necessary, then the laws of the State of New York to apply, not including any conflicts of law principles and any and all differences and disputes of whatever nature arising out of or in connection with this Charter Party shall be referred to three persons at New York, one to be appointed by each of the Parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc., current at the time of the Charter Party (see www.smany.org). In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000.00 (or such other sum as the parties may agree) the



## GeoNet - Stolt Nielsen Subject Agreement

arbitration may be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.

**45.    CONFIDENTIALITY CLAUSE**

Without the prior written consent of the other, neither Owner nor Charterer shall disclose the terms and conditions of this Charter Party or any information obtained in connection herewith concerning the other party or its business to any person or entity not controlling, controlled by or under common control with either of them, except for disclosure of (i) information that becomes or has been generally available to the public (other than as a result of a wrongful disclosure directly or indirectly by either Owner or Charterer); (ii) information learned from a third party entitled to disclose it; (iii) information already known before being disclosed; and (iv) information which must be disclosed by operation of law. The provisions of this clause shall also apply to Sound Tanker Chartering, Inc. See Exhibit "C."

**46.    GENERAL CONDITIONS**

**A.    Entire Agreement.**    This Agreement (alternatively referred to herein as the "Agreement," "Charter Party" and "Contract of Affreightment") represents the entire agreement between Charterer and Owner and supersedes all prior negotiations, representations or agreements, either written or oral. The Agreement may be modified or amended only by a written instrument executed by the parties hereto.  No modification or amendment to this Agreement shall be effective unless it is in writing and signed by the parties hereto.  There have been no representations, warranties or promises outside of this agreement.  This agreement shall take precedence over any other documents that may be in conflict with it.

**B.    No Waiver.**  No action or the failure to act by the Charterer or the Owner shall constitute a waiver of any right or duty afforded either of them under the Agreement , nor shall any such action or failure to act constitute an approval of or acquiescence in any breach thereunder, except as may be specifically agreed in writing.

**C.    Severability.**  If any provision or provisions of this Agreement  shall be held to be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and shall continue to be binding upon the parties hereto.

**D.    Headings.**  The Clause and Section headings, captions and subheadings used in the Agreement are for convenience of reference only and shall not affect the construction or interpretation of the Agreement.

**E.    Assignment.**  This Charter Party may not be assigned by either party without the prior written consent of the other.  Notwithstanding the foregoing, Owner and/or Charterer may assign this Agreement, in whole or in part, without prior consent of the other, to an affiliated or subsidiary company, or to an entity growing out of a consolidation of or



**GeoNet - Stolt Nielsen Subject Agreement**

acquisition by or merger with either party, or to a company or entity acquiring all or a substantial part of Owner's and/or Charterer's assets or business related to the subject of this Agreement. This Agreement will inure to the benefit of and be binding upon the successors and, if properly assigned, the assigns of both parties. Notwithstanding the above, Charterer retains the right to sublet whole voyages or part cargo space on voyages as per Asbatankvoy Clause 25.



**GeoNet - Stolt Nielsen Subject Agreement**

GeoNet Ethanol LLC
Standard Amendments to Asbatankvoy charter party form
August 2006

Ammendments to ASBATANKVOY Part II

Clause 2.  Freight
Delete 'Petroleum' and delete 'on delivery of cargo at destination"

Clause 24. Arbitration
Delete Clause 24 in its entirety.

## 1.  PRESENTATION

A.  Notices of Readiness given pursuant to Part II, Clause 6, shall not be properly tendered or deemed to be received by Charterer or Charterer's agent prior to the date stipulated in Part I (B) for commencing lay days except with Charterer's express permission.

B.  Notice of readiness shall be tendered only at the customary anchorage assigned for the port of loading and any notice of readiness tendered in a location other than customary anchorage shall become invalid unless sanctioned by Charterer.

C.  The Owner warrants that the crew members involved with cargo handling and navigation are sufficiently proficient in English to adequately communicate with shore personnel and authorities.

## 2.  COMPLIANCE

A.  The Owner warrants that during the term of this Charter Party, the performing vessel is fully classified for the carriage of Charterer's cargo(es) and complies with all local, national and international laws, rules and regulations relevant to the said cargo(es) and trade routes set forth in this Charter Party and carries all certificates, records, compliance letters, contingency plans and other documents required for the services performed by Owner under this Charter Party.  This includes, but is not limited to, IMO, MARPOL, USCG and the ISM Code, OPA 90/CFR and USCG Vapor Recovery.

B.  All vessel(s) are subject to acceptance by Charterer which may include an onboard Vessel Inspection by a Charterer's Representative.  The Charterer will accept or reject any vessel. The Charterer will be under no liability for rejecting a vessel (COA or vessel substitution).

C.  The Owner warrants that the vessel nominated has been inspected by a CDI qualified inspector within the past twelve (12) months or that the vessel has a valid Sire report on file.  Owner will provide Charterer with a copy of the most recent


SOUNDTANKER
CHARTERING

**GeoNet - Stolt Nielsen Subject Agreement**

CDI report and the most recent Sire report upon request by Charterer for each vessel nominated by Owner.

D. The Owner warrants that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code and carry valid certificates to this effect. Upon request, the Owner shall provide copies of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterer. Loss, damage, expense or delay caused by the failure on the part of the Owner, the vessel, or "the Company" to comply with the ISM Code shall be for Owner's account.

E. Owners warrant that the Vessel /Owners are members of a first class P & I Club and will remain so during the currency of Charter Party. Owner will provide Charterer with a copy of the P&I Certificate of Entry.

F. Owner / Vessel to comply with all United States Coast Guard and OPA regulations, including such regulations pertaining to Alcohol, drugs and drug testing. Any loss, claim or action resulting from Owner/Vessel's noncompliance shall be Owner's responsibility, and any resulting delay not to count as used laytime or demurrage.

G. Owner(s) warrants that throughout the duration of this COA they will make utmost efforts to maintain vessels in condition necessary to be found acceptable to oil or chemical major fleet vetting procedures. These shall include, ExxonMobil, Shell, and Chevron. This shall explicitly exclude BP or any other company currently requiring double hull vessels for all shipments.

H. Owner warrants that the vessel, when last nominated and presented for vetting, was accepted by Shell. Owner further warrants that, to the best of Owner's knowledge, nothing material has changed with respect to the vessel's condition which would prevent acceptance of the vessel by Shell vetting. In case the nominated vessel is rejected by Shell vetting, Owner will nominate alternative tonnage for the performance of the nominated voyage. If Owner's replacement tonnage is also rejected by Shell vetting, Charterer is free to charter outside tonnage for the performance of all pending and subsequent voyages until Owner nominates Shell approved tonnage.

3. **CLEANING**

A. Owner to clean all vessel's tanks, lines and pumps to Charterer's Inspector's satisfaction. Tanks to be tested by visual, odor and Tyndal tests. All and any inspection always to be carried out at the loading berth and never at previous berth(s), anchorage or roads, unless specifically agreed in writing by Charterer.

B. At the time of fixture for each sailing, Charterer shall state exact specifications and specific procedures required for wall wash testing, if any, and for foot sample testing, if any. These requirements shall be presumed to be reasonable and shall include details of hydrocarbons, chlorides, permanganate time, non-volatile matter specifications, color, and any other requirement. Failure to provide said



**GeoNet - Stolt Nielsen Subject Agreement**

requirements will result in a presumption that the cargo tank is subject only to visual inspection and that no wall wash or foot sample analysis will be accomplished. Any additional time and/or expenses incurred as a result of Charterer's failure to comply with its obligations under this clause shall be for Charterer's account.

C. If one or more of the Vessel's tanks fail the initial inspection as determined by Charterer's inspector and additional cleaning is necessary, Owner shall undertake such cleaning at its time and expense. Time and expense then required for Charterer's second inspection shall be for Owner's account providing that Charterer's inspector conducts said inspection within 4 hours after receipt of vessel notice afterwhich laytime or time on demurrage shall resume. Should Charterer's inspector not be satisfied with the cleanliness then obtained, Charterer shall have the option, on written notice to Owner, of canceling the Voyage without liability of either Party, one to the other, but, if this option is not exercised, then all time and expense attributable to additional cleaning and re-inspection(s) are for Owner's account.

D. Last three (3) cargoes in all tanks used under this Charter Party to consist of clean, unleaded materials which are not darker than 2.5, according to National Petroleum Standards (ASTM D-155) and subject to acceptance by Charterer and any of its customers that have special requirements, such as Shell Trading U.S. Company, which shall not be unreasonably withheld.

E. Vessel to supply coated and/or stainless steel tanks suitable for the carriage of Charterer's cargo.

F. Charterer is aware that vessel will be trading on a dedicated basis and tanks may be presented in a non-gas free state with last cargo being Charterer's ethanol.

## 4.  BERTHING/SHIFTING/LAYTIME

A. Owner warrants that it is fully aware of the operational restrictions of the named load port(s) and berths and named discharge port(s) and berths covered by this Charter and that the Vessel will, in all respects, comply with them. Any failure of a Vessel to comply with such restrictions shall be at Owner's sole risk and time.

B. Any time lost at load and/or discharge port(s), whenever/howsoever lost, which is directly/indirectly attributed to weather conditions and/or 'sea state', shall count as half laytime or if the vessel is on demurrage, at one half demurrage rate.

C. If after the disconnection of hoses, the vessel remains at the berth exclusively for the vessel's purposes, the Owner will be responsible for all direct or indirect costs charged to Charterer(s) by the terminal, the supplier(s) or the receiver(s). Alternatively vessel shall vacate the berth immediately upon the terminals request.

D. Charterer may load or discharge at one or more nominated berth(s) and/or place(s) per port. The net documented shifting costs, including but not limited to tugs, pilots, agency fees, linesmen, wharfage, dockage, quay dues and all fuel consumed during the applicable time within the port are for Charterer's account unless the Vessel is scheduled to call at or calls at berth(s) or place(s) for Vessel purposes or for other(s)



**GeoNet - Stolt Nielsen Subject Agreement**

in which case the Vessel shift shall be at no cost to Charterer. Laytime or time on demurrage to run continuously until hoses off at final discharge berth.

## 5. TRANSSHIPMENT

A. No transshipment under this Charter Party is allowed.

## 6. JURISDICTION/LAW

A. This Charter Party shall be governed by the General Maritime Laws of the United States.

B. Place of General Average (**"GA"**) and Arbitration to be New York and governed by the rules and regulations of The Society of Maritime Arbitrators.

C. General Average pursuant to York/Antwerp rules, 1994.

## 7. BILLS OF LADING

Discharging port(s) or range(s), shown in Bill(s) of Lading not to constitute a declaration of discharging port(s) or range(s) and Charterer to have the right to order the vessel to any port within the terms of this Charter.

If no original Bill of Lading is available at the discharge port(s) or if vessel is ordered to discharge in a port different from the destination as shown in the Bill of Lading, Owner is to discharge and release the entire cargo against a Letter of Indemnity provided by Charterer in accordance with Owner's Protection and Indemnity Insurance ("P and I") wording, no bank guarantee required.

## 8. PUMPING/HOSES

A. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk. Laytime to continue until hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses. (ASBATANKVOY Part II Clause 11)

B. Owner warrants that vessel will discharge a full cargo within 24 hours (or pro rata for part cargo) or will maintain a minimum discharge pressure of 100 psi at the vessel's manifold throughout discharge, provided receiving facilities are capable of accepting cargo within such time or at such pressure. Receiving terminal shall have the right to gauge discharge pressure at the vessel's manifold.

C. Any time consumed due to inability of vessel to discharge cargo within 24 hours or to maintain a minimum discharge pressure of 100 psi at the vessel's manifold throughout



**GeoNet - Stolt Nielsen Subject Agreement**

discharge will be for Owner's account and shall not count as used laytime (nor be compensated for at the demurrage rate if allowed laytime has expired).

D. In the event that demurrage is to be claimed by reason of alleged inability of receiving facilities to accept cargo within the warranted time or at warranted discharge pressure, vessel must present terminal and Charterer with a Note of Protest prior to departing berth and Owner will include a copy of the vessel's pumping record, Note of Protest and other supporting documentation with such claim. Failure to comply with this documentation requirement shall result in the claim being barred.

## 9. COMPLETION/ROTATION/SEGREGATION

A. Unless otherwise agreed, all Charterer's cargo to be considered full cargo and direct sailing guaranteed.

## 10. FORCE MAJEURE

In addition to ASBATANKVOY the following to apply:

A. Neither Party shall be liable for damages or otherwise to the extent that its ability to fulfill any provision of this Charter Party is delayed, hindered or prevented by, without limitation, act of God, fire, explosion, storm, flood, war (declared or undeclared), rebellion, revolution, invasion hostilities, martial law, riot, labor disputes of any kind, strike, lockout or injunction (whether or not such labor dispute is in the reasonable control of such party), perils of the sea or accident of navigation, compliance with any law, regulations or order imposed by any state or local authorities, breakdown of any plant of Charterer or Charterer's customers or suppliers, shutdown of any plant of Charterer's shippers or receivers caused by government action or inability to obtain fuel, power or raw materials, breakdown of loading or receiving facilities, embargoes or other import or export restrictions, closing of canals or rivers, blockage of canals, rivers, ports or waterways, any event, matter or thing wherever occurring and whether or not of the same class or kind as those set forth which by the exercise of due diligence the party concerned is unable to overcome, whether or not such occurrence is reasonably foreseeable.

B. Load Port (Force Majeure): In cases where the Charterer declares a Force Majeure, Charterer and Owner may agree to reduce the nominated volume. However, Owner will have the option to cancel the lifting or offer another vessel to carry the agreed upon volume without penalty or cost to Charterer.

C. In cases where the Owner declares a Force Majeure, Charterer is free to secure outside tonnage in the market.

D. Due to the specific nature of this trade, if the United States Government removes the present tariffs for the importation of ethanol to the United States or if the Caribbean Basin Initiative exclusion from this tariff is rescinded, or if Brazil imposes export controls or duties on hydrous ethanol or other raw materials used by Charterer in making its products, then the Charterer has the option to suspend performance under this Contract of Affreightment for up to six (6) months or to



**GeoNet - Stolt Nielsen Subject Agreement**

cancel this Charter Party without penalty or cost. In addition, Charterer can declare Force Majeure and exercise an option to suspend performance for up to six (6) months and then cancel this Charter Party or it can at the time it declares Force Majeure cancel this Charter Party without penalty or cost if the import duty exemption available under the Caribbean Basin Initiative becomes temporarily unavailable because the import quota set by such law has been met, or if the law is modified or a new law passed, to thereby create and/or impose an import duty or like tax with respect to foreign sourced ethanol dehydrated in St. Croix, Virgin Islands. In the event that Charterer declares Force Majeure and exercises its option to suspend performance under this Contract of Affreightment for up to six (6) months and subsequently lifts the suspension of performance within the six (6) months, then two (2) months shall be added to the period of the charter as defined by ASBATANKVOY Part I, Clause 2.

E. The ability of Charterer to manufacture fuel ethanol is dependent upon the ethanol dehydration plant which it is constructing becoming operational and on continued availability of necessary raw materials and products from its usual and anticipated suppliers and continued availability of energy supplies to its manufacturing facility in St. Croix, Virgin Islands. Prior to the ethanol dehydration plant becoming operational, Charterer may declare Force Majeure and suspend performance under this Charter Party until such time as the plant is operational. If the availability of sufficient quantities of such raw materials, products and/or energy supplies from those suppliers is restricted during the term of this Charter Party below that necessary to produce fuel ethanol in the amounts nominated in this Charter Party, then Charterer may declare Force Majeure and exercise an option to suspend its performance under this Charter Party for up to ninety (90) consecutive days or cancel this Charter Party without penalty or cost.

F. The Party declaring Force Majeure must provide immediate written notice of the declaration of Force Majeure to the other Party.

## 11. TAXES/DUES/WHARFAGE/SERVICES

A. Owner to pay for all port expenses, including customs overtime, wharfage, dockage, quay dues, taxes and similar charges at load and discharge port(s).

B. Any taxes levies or dues on vessel to be for Owners account.

C. Any taxes levies or dues on cargo or freight to be for Charterer's account.

D. In the event of any Brazilian taxes, dues or fees (including but not limited to, port utilization tax, Merchant Marine Renewal Tax and Consular fees), being assessed on the cargo, the vessel or her agents by reason of the carriage of this cargo, such charges shall be for Charterer's account and shall be paid by the Charterer or their agents without cost or risk to the Owner.

## 12. INCIDENT REPORTING

A. In the event of any situation whether at sea or in port that results either in:



**GeoNet - Stolt Nielsen Subject Agreement**

    i.   serious delay  or significant damage to the vessel and /or
   ii.   any damage to its cargo and / or
  iii.   any damage to the loading / discharging facility and / or
  iv.   any incident involving marine casualties and / or
   v.   any discharge of cargo into the sea caused by damage to the ship or equipment, or for securing the safety of the ship or saving life and / or
  vi.   any discharge of oil to the sea over  the quantity or rate permitted under applicable regulations during vessel operation

Owners are to immediately inform Charterer or their agents in the case of an above listed incident. In any event, Owners will immediately inform Charterer of any incident resulting in an expected delay of more than six (6) hours.

## 13. AUTOMATED MANIFEST SYSTEM (AMS) CLAUSE

A. If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Owners shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

    i)    Have in place a SCAC (Standard Carrier Alpha Code);
   ii)    Have in place an ICB (International Carrier Bond); and
  iii)    Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs.

B. The Charterer shall provide all necessary information to the Owners and/or their agents to enable the Owners to submit a timely and accurate cargo declaration.

C. The Charterer shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (excluding consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterer' failure to comply with any of the provisions of this sub-clause. Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall count as laytime or, if the Vessel is already on demurrage, time on demurrage.

D. The Owners shall assume liability for and shall indemnify, defend and hold harmless the Charterer against any loss and/or damage whatsoever (excluding consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Owners' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall not count as laytime or, if the Vessel is already on demurrage, time on demurrage.

E. The assumption of the role of carrier by the Owners pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.



**GeoNet - Stolt Nielsen Subject Agreement**

## 14. ITOPF

Owner warrants that vessel is entered with the International Tanker Owners Pollution Federation (ITOPF) at the commencement of this charter and will so remain during its term.

## 15. ETA CLAUSE

Owner to advise Charterer of the vessel's estimated time of arrival ("ETA") at 14/10/7/5/4/3/2/1 days prior to arrival at the load and discharge ports. Charterer shall not be liable for any demurrage in respect of any delay in loading and discharging attributable to the failure of the vessel to give notice of its estimated time of arrival (ETA) in accordance with this clause.

## 16. CLAIMS

Owner agrees to a ninety (90) day time bar on demurrage claims only. For other claims, the Parties agree to a one (1) year time bar from the date of discharge for all cargo claims in accordance with the U.S. Carriage of Goods by Sea Act ("U.S. COGSA") or from the date the claim arises for all other claims, including but not limited to indemnity and/or contribution claims.

## 17. ISPS CLAUSE FOR VOYAGE CHARTER PARTIES

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owner shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owner shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterer. The Owner shall provide the Charterer with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B)(i) The Charterer shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterer to comply with this Clause shall be for the Charterer's account and any delay caused by such failure shall be compensated at the demurrage rate.



(C) Provided that the delay is not caused by the Owner's' failure to comply with their obligations under the ISPS Code, and the measures imposed by the port facility or relevant authorities applies to all vessels in that port and not solely to Owner's vessel, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as one-half laytime or one-half time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterer at one half the demurrage rate and always in accordance with (A)(ii).

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be shared equally by both parties unless such costs or expenses result solely from the Owner's negligence. All measures required by the Owner to comply with the Ship Security Plan shall be for the Owner's account.

(E) If either Party makes any payment which is for the other Party's account according to this Clause, the other Party shall indemnify the paying Party.

## 18. NOTICES

Any notices pertaining to this Contract of Affreightment shall be deemed sufficient if personally delivered to the party, sent by facsimile, sent by e-mail or as an e-mail attachment, mailed by first class mail or as certified mail, return receipt requested, or if sent via Federal Express or similar overnight delivery services, addressed as follows:

Charterer:                          GeoNet Ethanol LLC
                                    One Estate Anguilla
                                    P.O. Box 2090
                                    Kingshill, St. Croix USVI 00851
                                    Telephone:    340 778-1479
                                    Facsimile:    340 778-1420
                                    e-mail address: jbrentbaker@geonetholdings.com



**GeoNet - Stolt Nielsen Subject Agreement**

Owner:                      Stolt-Nielsen Transportation Group BV
                            Westerlaan 5, Haven Nº 190
                            3016 CK Rotterdam
                            The Netherlands
                            Telephone:      +31 (0) 10 299 6666
                            Facsimile:      +31 (0) 10 264 4400
                            e-mail address: rlong@sntg.com
                                            aeadams@sntg.com

                            Company Security Officer:
                            Patrick Russi
                            PO Box 23213
                            Rotterdam 3001 KE
                            The Netherlands


IN WITNESS WHEREOF, authorized representatives of each of the Parties have executed this Agreement, effective as of the date written above.

Agreed to and accepted by:

GeoNet Ethanol LLC                        Stolt-Nielsen Transportation Group B.V.
                                          By Stolt-Nielsen Transportation Group
                                          Inc., as agents

By: _____                       By: _____  Stolt-Nielsen Transportation Group Inc.

Name: _President___                        Name: _ANDREW E. ADAMS_  **as agents for**

Title: _J. Brent BAKER_                    Title: _GENERAL MANAGER_  Stolt-Nielsen Transportation Group B.V.

Date: _5/25/07_                            Date: _30 MAY, 2007._

                    LWW

**GeoNet - Stolt Nielsen Subject Agreement**

EXHIBIT "A"


ASBATANKVOY FORM
CHARTER PARTY



Association of Ship Brokers
& Agents (U.S.A.), Inc.
October 1977

CODE WORD FOR THIS
CHARTER PARTY:
ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

Place                    Date

IT IS THIS DAY AGREED between _____
Chartered owner/owner (hereinafter called the "Owner") of _____
(hereinafter called the "Vessel")
SS/MS _____
(hereinafter called the "Charterer")
And _____
That the transportation herein provided for will be performed subject to the terms and conditions of this charter party, which includes the Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

A.    Description and Position of Vessel:

Net Registered Tonnage:

Deadweight:            tons (2240 lbs.)        Classed:

Loaded draft of Vessel on assigned summer freeboard ft.    in. in salt water.

Capacity for cargo:        tons (of 2240 lbs. Each)    % more or less, Vessel's option

Coated:        ___ Yes ____ No

Coiled:        ___ Yes ____ No        Last two cargoes:

Now:                                    Expected Ready:

B.    Laydays:

        Commencing:                    Cancelling:

C.    Loading Port(s):                        Charterer's option

D.     Discharging Port:                                                              Charterer's option

E.     Cargo:                                                                    Charterer's option

F.     Freight Rate:                                          per ton (of 2240 lbs. Each).

G.     Freight Payable to:                                             at

H.     Total Laytime in Running Hours:

I.     Demurrage per day:

J.     Commission of        % is payable by Owner to

on the actual amount freight, when and as freight is paid.

K.     The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.     Tovalop:  Owner warrants vessel to be member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.     Special Provisions.

        IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness to signature of:                    _____

                                              By: _____

Witness to signature of:                    _____

                                              By: _____

PART II

1. WARRANTY-VOYAGE-CARGO. The vessel, classed as specified in Part I hereof, and to be maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer's full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.
(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

On a voyage to a port or ports in:

ST. KITTS     Caribbean or U.S. Gulf loading port(s)
PORT SAID     Eastern Mediterranean or Persian Gulf loading port(s)
              (from ports west of Port Said.)

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) Or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTER | Mediterranean (from Western Hemisphere). |

© Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used Laytime.

5.     LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the canceling date stipulated in Part I, the Charterer shall have the option of canceling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e. finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs.; However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has not control, such delay shall no count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as Laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel is moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. (a) Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate stipulated in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge because by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced to one-half the amount stated in Part I per running hour or pro rata for part of an hour for demurrage

incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout stoppage or restraint of labor for Master, officers and crew of the vessel or tugboat or pilots.

9. SAFE BERTHING-SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart there from always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10.    PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging I all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the charter, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES-TAXES-WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the Basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13.  (a).  CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 degrees F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 degrees F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14.  (a).  ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available the Charterer, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part 1 F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

© Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.  GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17. QUARANTINE. (a) Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not to be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION.  If the Vessel, prior to or after entering upon this Charter, has docked or docks at an wharf which is not rat-free or stegomyia-free, she shall before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.        GENERAL EXCEPTIONS CLAUSE.  The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:-any act, neglect, default or barratry of the Master, pilots, mariners or their servants of the Owner in the navigation or management of the Vessel; fire, unless caused by personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the vessel nor Master or Owner, nor the Charterer, shall, unless so otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from;-Act of God; act of war; perils of the sea; act of public enemies, pirates or assailing thieves; arrest of restraint of princes, rulers or people; or seizure under legal process provided bond is  promptly furnished to release the vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING
(a) The master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading.  In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT.  This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act.  If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii) JASON CLAUSE.  In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Owner is not responsible by statute, contract, or otherwise, the cargo shippers, consignees, or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.  If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the salving ship or ships belong to strangers.  Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, by made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE.  General average shall be adjusted, stated and settled, according to York-Antwerp Rules 1950, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter.  If a General Average statement is required, it shall be prepared at  such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer.  Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges.  General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested.  Ay cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized an licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME COLLISION CLAUSE. If the Vessel comes into collision with another ship as a result of negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier. The foregoing provisions shall also apply where the owners operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

(v) LIMITATION OF LIABILITY.   Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS.  (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of the international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge-the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo threat is not in the Master's or Owner's discretion dangerous or prohibited).  If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port the Owner shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo threat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

© The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, water, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations.  If by reason of or incompliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or incompliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owner shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE.  The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel or stores at any port or ports in or out of the regular course of the voyage.  Any salvage shall be for the sole benefit of the Owner.

21.  LIEN.  The Owner shall have an absolute lien on the cargo for all freight, dead freight, demurrage and costs, including attorney's fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any bills of lading covering the same, or of any storageman.

22. AGENTS.  The Owner shall appoint Vessel's agents at all ports.

23.  BREACH.  Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24.  ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the city of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service

upon any officer of the other, wherever may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court maritime jurisdiction in the city above mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precise the same force and effect as if such arbitrator had been appointed by the tow arbitrators. Until each time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc. retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

BILL OF LADING

Shipped in apparent good order and condition by _____

On board the _____ Motorship/Steamship _____

whereof _____ is Master, at the port of_____

_____

_____

_____

_____

to be delivered at the port of _____

or so near thereto as the Vessel can safely get, always afloat, unto _____

_____

or order on payment of freight at the rate of_____

_____

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London _____

Between _____ and _____, as Charterer, and all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____day of _____

_____

Master

**GeoNet - Stolt Nielsen Subject Agreement**

EXHIBIT "B"

**STOLT-NIELSEN TRANSPORTATION GROUP BV**

**TANKER BILL OF LADING**

**FORM**



# THE STOLT TANKERS

## TANKER BILL OF LADING B/L No.

Shipped on board in apparent good order and condition by (shipper) _____

on board the tanker _____ at the port of _____

whereof _____ is the Master, to be delivered to the port of _____

Consignee/Order of _____

Notify: _____

Combined transport, precarriage from: _____

Combined transport onward carriage: _____

On board barge/transshipment vessel: _____

On board date, ocean carrier: _____

When the Pre-carriage or Onward Carriage lines are filled out, shipment will be treated as Through Combined Transport. Carrier undertakes entire transport from the place where the cargo is taken in charge to place designated for its delivery and assumes full liability for such transport as per the governing Charter Party.

A quantity in bulk said by the shipper to be:

| COMMODITY (Name of Product) | QUANTITY (lbs/tons/barrels/gallons) |
|---|---|

OCEAN CARRIAGE STOWAGE:

The quantity, measurement, weight, gauge, quality, nature and value and actual condition of the cargo unknown to the carrier, the Vessel and the Master, to be delivered at the port of discharge or so near thereto as the Vessel can safely get, always afloat upon prior payment of freight as agreed.

This shipment is carried under and pursuant to the terms of the Charter dated

|  | Month | Day | Year |
|---|---|---|---|

at _____ , _____ between S.N.T.G. B.V.

and _____ as Charterer, and all the terms whatsoever of the said Charter, including the arbitration clause, except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment. Copy of the Charter may be obtained from the Shipper or Charterer. The freight is earned concurrent with loading, ship and/or cargo lost or not lost or abandoned.

The Owner shall have an absolute lien on the cargo for all freight, dead freight, demurrage/detention and for costs/expenses including attorney's fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the of the holders of any bills of lading covering the same, or of any storageman. Owner shall be entitled to sell the property liened and apply the proceeds toward satisfaction of any such sums due.  This lien shall apply for any sums due under the above mentioned contract of affreightment.

If this Bill of Lading is a document of the title to which the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, applies by reason of the port of lading or discharge being in territory in which the said Act is in force, this Bill of Lading shall have effect subject to the provisions of the said Act which shall be deemed incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading is repugnant to the said Act as so incorporated, such terms shall be void to that extent but no further. The contract of carriage evidenced by this Bill of Lading between the shipper, consignee and/or owner of the cargo and the owner or demise charterer of the vessel named herein to carry the cargo described above (the "Carrier"). It is understood and agreed that, other than said shipowner or demise charterer, no person, firm or corporation or other legal entity whatsoever, is or shall be deemed to be liable with respect to the shipment as carrier, bailee or  otherwise in contract or in tort. If, however, it shall be adjudged that any other than said shipowner or demise charterer is carrier or bailee of said shipment or under any responsibility with respect thereto, all limitations of or exonerations from liability anS all defenses provided by law or by the terms of the contract of carriage shall be available to such other.

In Witness Whereof, the Master has signed _____
Bills of Lading of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____ 20_____

**GeoNet - Stolt Nielsen Subject Agreement**

EXHIBIT "C"

**CONFIDENTIALITY AGREEMENT**

Sound Tanker Chartering, Inc. has participated in the negotiations of the attached Contract of Affreightment ("COA"), and it is entitled to receive a commission under the terms of Clause 14 of such COA. In consideration of the promise to pay, and for other valuable consideration, the receipt of which is hereby acknowledged, Sound Tanker Chartering, Inc. hereby agrees that it will not, without the prior written consent of GeoNet Ethanol LLC or Stolt-Nielsen Transportation Group BV, disclose the terms and conditions of the attached COA or any information obtained in connection with such COA concerning either party to the COA or its/their business(es) to any person or entity not controlling, controlled by or under common control with either of them, except for disclosure of (i) information that becomes or has been generally available to the public (other than as a result of a wrongful disclosure directly or indirectly by either GeoNet Ethanol LLC or Stolt-Nielsen Transportation Group BV); (ii) information learned from a third party entitled to disclose it; (iii) information already known before being disclosed; and (iv) information which must be disclosed by operation of law.

Sound Tanker Chartering, Inc.

By: _____

Name: _Mark Ellenberger_

Title: _General Manager_

Date: _May 29, 2007_

**GeoNet - Stolt Nielsen Subject Agreement**

EXHIBIT "D"

**STOLT-NIELSEN CONTACT LIST**

| | | |
|---|---|---|
| **Locations** | Houston | Stolt-Nielsen Transportation Group<br>15635 Jacintoport Blvd<br>Houston  TX  77015-5534 |
| | Norwalk | Stolt-Nielsen Transportation Group<br>800 Connecticut Avenue 4th Floor East<br>Norwalk CT 06854 |

**COA negotiations**

Andrew Adams
General Manager -
Inter Caribbean Services
Houston
aeadams@sntg.com
DD (281) 860 4907
Mb (713) 885 5951
Hm (713) 838 0016

Always copy          Jim Byrne

**Day to day chartering** including
Nominations, vessel positions, ETA's

Jim Byrne
Shipbroker
Houston
jbyrne@sntg.com
DD (281) 860 4908
Mb (713) 825 9201

Always copy          Andrew Adams


**SOUNDTANKER**
CHARTERING

5/21/2007

## GeoNet - Stolt Nielsen Subject Agreement

**Operations** including
Stowage, port progress, B/L's, documents

John Ashielfie
Operations supervisor
Houston
jashielfie@sntg.com
DD (281) 860 4906
Mb (281) 830 3509
Hm (281) 334 9658

Always copy

Jim Byrne

**Official address** for receipt of process etc

Andrew Adams
aeadams@sntg.com
Raymond Long
Business director & Senior VP –
Atlantic Ocean Services
Norwalk
rlong@sntg.com

SNTG BV c/o
Stolt-Nielsen Transportation Group Inc
800 Connecticut Avenue 4th Fr East
Norwalk CT 06854

**Freight payment**

Norma Frias
Collections analyst
Houston
nfrias@sntg.com
DD (281) 860 5196

Always copy

Dot Salisbury
Accounts receivable manager
Houston
dsalisbury@sntg.com
DD (281) 860 6965

**Demurrage**

John Bailey
Norwalk
jbailey@sntg.com
DD (203) 299 3656



5/21/2007

# State of New York
# Department of State } ss:

*I hereby certify, that GEONET ETHANOL, LLC a US VIRGIN ISLAN Limited Liability Company filed an Application for Authority pursuant to the Limited Liability Company Law on 12/11/2006. I further certify that so far as shown by the records of this Department, such Limited Liability Company is still authorized to do business in the State of New York.*



***

*Witness my hand and the official seal of the Department of State at the City of Albany, this 13th day of June two thousand and eight.*

Daniel Shapiro
Special Deputy Secretary of State

*200806160449 * 45*

# STATE OF NEW YORK

# DEPARTMENT OF STATE

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on June 16, 2008.

Paul LaPointe
Special Deputy Secretary of State

Rev. 06/07

*F* **061211000***lAA*

**DRAWDOWN
ACCT. #  01**

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
41 State Street
Albany, NY 12231
www.dos.state.ny

## APPLICATION FOR AUTHORITY
## OF

GeoNet Ethanol LLC

*(Insert name of Foreign Limited Liability Company)*

Under Section 802 of the Limited Liability Company Law

**FIRST:** The name of the limited liability company is:

GeoNet Ethanol LLC

If the name does not contain a required word or abbreviation pursuant to Section 204 of the Limited Liability Company Law, the following word or abbreviation is added to the name for use in this state:

(Do not complete this section unless the limited liability company's true name is not available pursuant to §204 of the Limited Liability Company Law.) The fictitious name under which the limited liability company will do business in New York is:

**SECOND:** The jurisdiction of organization of the limited liability company is:

US Virgin Islands                    . The date of its organization is: ( November 4, 2005 )

**THIRD:** The county within this state in which the office, or if more than one office, the principal office of the limited liability company is to be located is:  Albany
(A county in New York State must be stated. Please note that the limited liability company is not required to have an actual physical office in this state.)

**FOURTH:** The Secretary of State is designated as agent of the limited liability company upon whom process against it may be served. The address within or without this state to which the Secretary of State shall mail a copy of any process served against him or her is:
Capitol Services, Inc.    40 Colvin Avenue, Suite 200

Albany                                New York            12206

DOS-1381 (Rev. 12/05)

*1*

**FIFTH:** (Complete the statement that applies)

The address of the office required to be maintained in the jurisdiction of its formation is: _____

_____

_____

If no office is required to be maintained in the jurisdiction of its formation, the address of the principal office of the limited liability company is: _____

One Estate Anguilla, PO Box 2090

Kingshill, St. Croix                          US Virgin Islands          00851-2090

**SIXTH:** The foreign limited liability company is in existence in its jurisdiction of formation at the time of filing of this application.

**SEVENTH:** The name and address of the Secretary of State or other authorized official in its jurisdiction of organization where a copy of its articles of organization is filed is: _____

Office of the Lieutenant Governor, Division of Corporation & Trademarks 340-77608515

Kongens Gade No. 18                   Charlotte Amalie, St. Thomas VI     00802

X _Phil Dalton_
*(Signature)*

Philip A. Dalton
*(Type or print name)*

Chief Operating Officer
*(Title or capacity of signer)*

Please Note: A certificate of existence or, if no such certificate is issued by the jurisdiction of formation, a certified copy of the articles of organization of the limited liability company and all subsequent amendments therefore, or if no articles of organization have been filed, a certified copy of the certificate filed as its organizational base and all amendments thereto, must be attached to the application for authority when submitted for filing. If such certificate or certified copy is in a foreign language, a translation in English thereto under oath of the translator shall be attached.



Corp No. **554855**

## GOVERNMENT OF
## THE VIRGIN ISLANDS OF THE UNITED STATES
— O —
## CHARLOTTE AMALIE, ST. THOMAS, VI 00802

# CERTIFICATE OF EXISTENCE

**To All To Whom These Presents Shall Come:**

I, VARGRAVE A. RICHARDS, Lieutenant Governor of the Virgin Islands do hereby certify that I am, by virtue of the laws of the Virgin Islands, the custodian of the corporate records and the proper officer to execute this certificate.

I further certify that the records of this office disclose that

**GeoNet Ethanol, LLC**

**Limited Liability Company**

was duly registered to conduct business in the Territory on **November 4, 2005** and has a legal existence as a Limited Liability Company so far as the records of this office show.



Witness my hand and the seal of the Government of the Virgin Islands of the United States, at Charlotte Amalie, St. Thomas, this 4th day of December, 2006.

VARGRAVE A. RICHARDS
Lieutenant Governor of the Virgin Islands

3

*CSI-01*

*f* **061211000** *644*

## APPLICATION FOR AUTHORITY
### OF

_____
**GeoNet Ethanol LLC**
*(Insert name of Foreign Limited Liability Company)*

Under Section 802 of the Limited Liability Company Law

**STATE OF NEW YORK**
**DEPARTMENT OF STATE**
FILED DEC 11 2006
TAX $_____
BY: _____

**Filed by:**   Philip A. Dalton
_____
*(Name)*

One Estate Anguilla, PO Box 2090
_____
*(Mailing address)*

*CSI-01*

Kingshill, St. Croix, US Virgin Islands  00851-2090
_____
*(City, State and Zip code)*

DRAWDOWN ACCOUNT

NOTE: This form was prepared by the New York State Department of State for filing an application for authority for a foreign limited liability company to conduct business in New York State. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal supply stores. The Department of State recommends that legal documents be prepared under the guidance of an attorney. The certificate must be submitted with a $250 filing fee made payable to the Department of State.

_____
*(For office use only.)*

2006 DEC 11  PH 1: 05

2006 DEC 11  PM 12: 08
RECEIVED

2006 DEC -8  PM 4: 21
RECEIVED

*f* **061211000** *683*

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on June 16, 2008.

Paul LaPointe
Special Deputy Secretary of State

Rev. 06/07

070726000 248

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231
www.dos.state.ny.us

# CERTIFICATE OF CHANGE
# OF

## GEONET ETHANOL, LLC
*(Insert name of Foreign Limited Liability Company)*

Under Section 804-A of the Limited Liability Company Law

**FIRST:** The name of the foreign limited liability company is: _____
**GEONET ETHANOL, LLC**

If applicable, the fictitious name the foreign limited liability company has agreed to use in this state
is: _____ .

**SECOND:** The application for authority was filed with the Department of State on: _____
**DECEMBER 11, 2006** .

**THIRD:** The change(s) effected hereby are: *[check appropriate statement(s)]*

☐ The county location, within this state, in which the office of the foreign limited liability
company is located, is changed to: _____ .

☒ The address to which the Secretary of State shall forward copies of process accepted on
behalf of the foreign limited liability company is changed to read in its entirety as follows:
c/o Capitol Services, Inc. 1218 Central Avenue, Suite 100 Albany    NY 12205
_____ .

☐ The foreign limited liability company hereby: *[check one]*
    ☐ Designates _____
as its registered agent upon whom process against the foreign limited liability
company may be served. The street address of the registered agent is_____

    ☐ Changes the designation of its registered agent to: _____
_____ . The street address of the registered agent is: _____

    ☐ Changes the address of its registered agent to: _____

    ☐ Revokes the authority of its registered agent.

x *Phil Dalton*
*(Signature)*

PHIL DALTON
*(Type or print name)*

Chief Operating Officer
*(Title of signer)*

DOS-1362 (Rev. 6/06)

-1-

0707260001248

# CERTIFICATE OF CHANGE

## OF

### GEONET ETHANOL, LLC

*(Insert name of Foreign Limited Liability Company)*

Under Section 804-A of the Limited Liability Company Law

Filed by:  **Capitol Corporate Services, Inc.**
*(Name)*

**P. O. Box 1831**
*(Mailing address)*

**Austin, Texas   78767**
*(City, State and Zip code)*

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED   JUL 26 2007

TAX $
BY:

NOTE: This form was prepared by the New York State Department of State for filing a certificate of change by a foreign limited liability company. You are not required to use this form. You may draft your own form or use forms available at legal supply stores. The Department of State recommends that legal documents be prepared under the guidance of an attorney. The certificate must be submitted with a $30 filing fee made payable to the Department of State.

*(For office use only)*

258

-2-

# STATE OF NEW YORK

# DEPARTMENT OF STATE

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on June 16, 2008.

Paul LaPointe
Special Deputy Secretary of State

Rev. 06/07

DRAWDOWN
ACCT. #__01

0704 02 000 773

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231
www.dos.state.ny.us

# CERTIFICATE OF PUBLICATION
## OF

### GEONET ETHANOL, LLC
*(Name of Foreign Limited Liability Company)*

Under Section 802 of the Limited Liability Company Law

The undersigned is the _____ **AUTHORIZED PERSON** _____ of
*(Title\*)*

### GEONET ETHANOL, LLC
*(Name of Foreign Limited Liability Company)*

If the name of the foreign limited liability company has changed, the name under which it was authorized is: _____ .

If applicable, the fictitious name the foreign limited liability company has agreed to use in this state is: _____ .

The application for authority was filed by the Department of State on: _____

The published notices described in the annexed affidavits of publication contain all of the information required by Section 802 of the Limited Liability Company Law.

The newspapers described in such affidavits of publication satisfy the requirements set forth in the Limited Liability Company Law and the designation made by the county clerk.

I certify the foregoing statements to be true under penalties of perjury.

3-29-07
*(Date)*

*Phil Dalton*
*(Signature)*

PHILIP
Phillip A. Dalton
*(Type or Print Name)*

\* This certificate must be signed by a member, manager, attorney-in-fact or authorized person

DOS-1707 (Rev. 11/06)

ALBANY TIMES UNION
NEWS PLAZA
BOX 15000
ALBANY, NEW YORK 12212

Affidavit of Publication Under Section _____*802*_____ of the Limited
Liability Company Law State of New York, County of Albany, ss.: The undersigned is the
Publisher of the Times Union, a daily newspaper in Albany, New York. A notice
regarding *GEO NET ETHANOL, LLC*
(name of limited liability company) was published in said newspaper once in each week
for six consecutive weeks, commencing on *1/31/07* and ending
on *3/7/07*. The text of the notice as published in said
newspaper is as set forth below, or in the annexed exhibit. This newspaper has been
designated by the Clerk as a newspaper of record for the following counties for this
purpose:

Albany          ✓
Rensselaer      _____
Saratoga        _____
Schenectady     _____

*Roger Zalucky* *3/8/07*      (Signature & Date)
*Roger Zalucky* (Printed Name)
Authorized Designee of Mark Aldam, Publisher of the Times Union

Subscribed and sworn to before me,
This ___*8th*___ day of *March* 20 *07*

*Lisa A Towne*
Notary Signature
Albany County

LISA A. TOWNE
Notary Public, State of New York
No. 01TO6097662
Qualified in Saratoga County
My Commission Expires Aug. 25, 2007

Notary Public Stamp

Notice of Qualification of GeoNet Ethanol, LLC. Authority filed with Secy. of State of N.Y. (SSNY) on 12/11/06. Office location: Albany County. LLC formed in US Virgin Islands (VI) on 11/4/05. SSNY designated as agent of LLC upon whom process against it may be served. SSNY shall mail process to: Capitol Services, Inc., 40 Colvin Avenue, Ste. 200, Albany, NY 12206. VI address of LLC: One Estate Anguilla, PO Box 2090, Kingshill, St. Croix, US VI 00851. Arts. of Org. filed with Office of Lt. Governor, Div. of Corps. & Trademarks, 340-7760S515, Kongens Gade No. 18, Charlotte Amalie, St. Thomas, VI 00802. Purpose: importation of fuel ethanol by ship and/or barge for customer's use in making gasohol.    TU6T(3033262)

# AFFIDAVIT OF PUBLICATION

Under Section ___*802*___ of the Limited Liability Company Law

Under Section _____ of the Partnership Law

State of New York

County of Albany

The undersigned is the printer (or publisher) of ___*COLONIE SPOTLIGHT*___ a weekly newspaper
published in ___*DELMAR*___, New York.

A notice regarding ___*CRBONET ETHANOL, LLC*___

was published in said newspaper once in each week for six successive weeks, commencing on __1/31/07__
and ending on __3/7/07__. The text of this notice as published in said newspaper is as set forth below, or in
annexed exhibit. This newspaper has been designated by the Clerk of Albany county for this purpose.

_____ The Spotlight

✓ Colonie Spotlight

_____ Guilderland Spotlight

The Spotlight Newspapers
The Capital District's Quality Weeklies
125 Adams Street
Delmar, NY 12054

Maureen Basalla

SWORN TO BEFORE ME THIS __16__ DAY OF __MARCH__, 2007

_____, NOTARY PUBLIC

SHARON A. DOLDO
No. 01DO5038536
Notary Public, State of New York
Qualified in Onondaga County
Commission Expires Jan 30, 20 11

C:\DOCUME~1\sharon_d\Desktop\SPOTLI~1\AFFIDAVII OF PUBLICATION.doc

**LEGAL NOTICE**

Notice of Qualification of GeoNet Ethanol, LLC Authority filed with Secy. of State of N.Y. (SSNY) on 12/11/06. Office location: Albany County. LLC formed in US Virgin Islands (VI) on 11/4/05. SSNY designated as agent of LLC upon whom process against it may be served. SSNY shall mail process to: Capitol Services, Inc., 40 Colvin Avenue, Ste. 200, Albany, NY 12206. VI address of LLC: One Estate Anguilla, PO Box 2090, Kingshill, St. Croix, US VI 00851. Arts. of Org. filed with Office of Lt. Governor, Div. of Corps. & Trademarks, 340-77608515, Kongens Gade No. 18, Charlotte Amalie, St. Thomas, VI 00802. Purpose: Importation of fuel ethanol by ship and/or barge for customer's use in making gasohol.
LC-15169
(March 7, 2007)

*CSI-01*

070402000 773

CERTIFICATE OF PUBLICATION

OF

GEONET ETHANOL, LLC
*(Name of Foreign Limited Liability Company)*

Under Section 802 of the Limited Liability Company Law

Filed by:  Geonet Ethanol LLC
*(Name)*

One Estate Anguilla
*(Mailing Address)*

Kingshill ST Croix, VI 00851
*(City  State and Zip Code)*

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED    APR 0 2 2007
TAX $
BY:

Note: This form was prepared by the New York State Department of State for filing a certificate of publication for a foreign limited liability company.  You are not required to use this form.  You may draft your own form or use forms available from legal stationery stores  The Department of State recommends that legal documents be prepared under the guidance of an attorney.  This certificate of publication, with the affidavits of publication of the newspapers annexed thereto, must be submitted with a $50 filing fee payable to the Department of State

*For DOS Use Only*

RECEIVED
2007 APR -2  PM 12

Attach this page after the affidavits of publication.

855

*CSI-01*

DRAW DOWN
ACCOUNT

2007 APR -2  PM 5: 23
FILED